```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:                                  :
                                        :
DELTA AIR LINES, INC.,                  :
                                        :
                        Debtors.        :
                                        :
----------------------------------------X
                                        :
WILLIAM C. BUERGEY, et al.,             :
                                        :
                        Appellants,     :
                                        :
            -v-                         :
                                        :   06 Civ. 9418(DLC)
DELTA AIR LINES, INC.,                  :
                                        :   OPINION & ORDER
                  Debtor-Appellee,      :
                                        :
            and                         :
                                        :
OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
OF DELTA AIR LINES, INC., et al.,       :
                                        :
                        Appellee.       :
                                        :
----------------------------------------X
```

Appearances

For appellants:
Jeffrey L. Sapir
Sapir & Frumkin LLP
399 Knollwood Road, Suite 310
White Plains, NY 10603

For debtor-appellee Delta Air Lines, Inc.:
John Fouhey
Marshall S. Hubner
Brian S. Weinstein
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

For appellee Official Committee of Unsecured Creditors of Delta
Air Lines, Inc., et al.:
Lisa G. Beckerman
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, NY 10022

L. Rachel Helyar
Johanna R. Shargel
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East
Los Angeles, CA 90067

DENISE COTE, District Judge:

    This appeal arises out of the bankruptcy of Delta Air
Lines, Inc. ("Delta").  Appellants are 223 retired Delta pilots
who receive retirement benefits from the Delta Pilots Retirement
Plan (the "Pilot Plan" or "Plan").  On August 4, 2006, Delta and
18 of its 25 subsidiaries (collectively, "Debtors") moved the
United States Bankruptcy Court for the Southern District of New
York for a determination that they satisfied the financial
requirements necessary to make a "distress termination" of the
Pilot Plan under Section 4041(c) of the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. § 1341(c).  Through an
Order of September 5 (the "September 5 Order"), the Bankruptcy
Judge granted the motion, and on October 16, appellants filed
the instant appeal.[1]  For the following reasons the September 5
Order is affirmed.

---

[1] The notice of appeal filed with the Bankruptcy Court, however,
was dated September 18.

Background

     The following facts are taken from the parties' submissions

on the instant motion and are uncontested except where otherwise

noted.  Delta has maintained its Pilot Plan since 1972.  It is a

"tax-qualified" defined benefit plan subject to the complex

requirements of ERISA and the Internal Revenue Code.  A Delta

pilot who retires at age 60 -- the mandatory retirement age for

pilots under federal law -- is entitled to receive an annual

pension benefit equal to 60% of his or her average annual

earnings over the last three years of employment.[2]  For many

pilots, this benefit is not paid entirely out of the funds of

the Pilot Plan.  Because the Internal Revenue Code presently

limits to approximately $200,000 the amount of annual income

that can be considered in determining the pension benefit

payable from a tax-qualified plan, pilots who end their careers

at Delta with salaries in excess of that limit draw only part of

their pension benefits from the Pilot Plan.  They get the

remainder from related "non-qualified" plans that are less

heavily regulated.

     Upon retirement, a Delta pilot must choose whether to have

the entire pension benefit paid out in monthly installments over

---

[2] This benefit is reduced if the pilot is less than 60 years old
or has worked for Delta for less than 25 years.  Delta allows
its pilots to take early retirement at age 50.

the course of his or her life, or to take a one-time lump sum
payment equal to 50% of the present value of the total projected
benefit, with the remainder payable as a monthly annuity.
Although the lump sum is calculated based on the total projected
benefit, it is paid out exclusively from the funds of the tax-
qualified Pilot Plan; no contribution is made from the non-
qualified plans.

I. The Delta Bankruptcy

    According to appellees, Delta's financial condition began
deteriorating seriously in 2001.  As a result, the airline made
only the minimum required contributions to the Pilot Plan
between 2002 and 2004.  On September 14, 2005, Debtors filed
voluntary bankruptcy petitions under Chapter 11 of the United
States Bankruptcy Code, and Delta stopped funding the Pilot Plan
altogether, except for the small amounts necessary to cover
post-petition costs.  In October 2005, the Pilot Plan went into
"liquidity shortfall," meaning the value of its liquid assets is
less than three times its adjusted disbursements for the prior
12 months.  When this occurs to a plan covered by ERISA, the
plan is prohibited from paying lump sums until it comes out of
shortfall.  Therefore, the Pilot Plan has not made any lump-sum
payments to retiring pilots in over a year.

Since 1989, when the lump-sum option became available, the majority of retiring pilots have taken advantage of it.[3]  As Delta's economic fortunes declined in 2001, the number of pilots who took early retirement and opted for the lump-sum payment increased dramatically.  After the lump-sum option became unavailable in 2005, however, the number of pilots opting for early retirement plummeted: In the 12 months prior to the bankruptcy filing, approximately 1,100 pilots took early retirement, whereas in the 10 months that followed, only 51 pilots did so.

Because so few payouts have occurred since the filing, the amount of liquid assets that ERISA requires the Pilot Plan to have on hand has decreased.  Therefore, as of the time the termination motion was filed, the Pilot Plan was projected to emerge from liquidity shortfall by October 1, 2006 at the latest.  If Delta had not indicated that it intended to terminate the Pilot Plan, the Plan would have had to begin offering retiring pilots the lump-sum option again at that time.

II. The Termination Motion

On June 19, 2006, a Notice of Intent to Terminate the Pilot Plan was issued to all Plan participants, and on August 4,

---

[3]  Lump-sum payments are often more than $500,000, and between October 2004 and October 2005, the average lump sum paid out by the Pilot Plan was $760,000.

Debtors filed the termination motion.[4]  The next day, Debtors served copies of a Notice of Motion (the "Notice") on all known Plan participants by first class mail.  The Notice informed recipients that Delta and its debtor subsidiaries had recently filed a motion for approval of the distress termination of the Pilot Plan, and that any objections to the motion had to be filed and served by August 17 "in accordance with the Order Approving Notice, Case Management and Administrative Procedures ... entered in these cases (Docket No. 660)."[5]  It also provided the time, date, and location at which the hearing on the motion was to occur, and stated that "the [m]otion and accompanying

---

[4]   Title IV of ERISA establishes an insurance program for such plans, which is administered by the Pension Benefit Guarantee Corporation ("PBGC"), a United States government-owned corporation.  If a plan covered by the statute terminates without sufficient assets to pay all of its liabilities -- as would be the case with the Pilot Plan -- PBGC becomes trustee and is responsible for paying the plan's beneficiaries.  See 29 U.S.C. §§ 1321, 1322, and 1361.  Because of statutory payment caps and other rules, however, beneficiaries of a terminated plan may not receive the full value of their pensions from PBGC.

[5] The Order Approving Notice, Case Management and Administrative Procedures (the "Case Management Order") was entered by the Bankruptcy Court on October 5, 2005, and required, among other things, that

> [A] "Notice of Motion" shall be affixed to all Motions and shall include the following: (i) the title of the Motion, (ii) the parties upon whom any Objection to the Motion is required to be served, (iii) the date and time of the applicable Objection Deadline, (iv) the date of the Omnibus Hearing at which the Motion shall be considered by the Court and (v) a statement that the relief requested may be granted without a hearing if no Objection is timely filed and served in accordance with these Procedures."

filings, as well as further information regarding the Debtors'
chapter 11 cases, are available online at www.deltadocket.com."
The motion itself, however, was not attached to the Notice.

Written objections were filed by several retired Delta
pilots -- some of whom are appellants here -- and by Delta
Pilots Pensions Termination Opposition, LLC ("DP2"), an
organization created and funded by a group of retired Delta
pilots to oppose the termination of the Plan.  No objections
were made by the PBGC, the Air Line Pilots Association,
International ("ALPA"), or DP3, Inc. ("DP3").  DP3's membership
included more than half of the population of retired Delta
pilots, and it had represented those interests in other
proceedings before the Bankruptcy Court.

In advance of the hearing, Debtors submitted declarations
from four witnesses who described the rationale for the
termination motion: (1) Margaret McDaniel ("McDaniel"), Delta's
actuary and a principal at the human resources and consulting
firm of Towers Perrin; (2) Timothy Coleman ("Coleman"), a
managing director of the Blackstone Group, the Debtors' primary
financial advisor; (3) Edward Bastian, executive vice president
and chief financial officer of Delta; and (4)David Watson,
Delta's director of pilot resources and scheduling.  The Debtors
argued that, unless the Pilot Plan were terminated, the Debtors
would face a crippling wave of early retirements that would

ground a substantial portion of their fleet and result in a $1.3 to $2.1 billion reduction in cash flow.  Furthermore, Delta would immediately owe $1.2 to $1.5 billion in cash contributions to the Plan.  As a result, Debtors contended, they would require between $5.2 and $6.6 billion in exit financing to emerge from bankruptcy -- an amount that lenders would have been unwilling to provide a company in Delta's financial condition, particularly given that all of its available collateral had been pledged on previous loans.

DP2 objected primarily on the ground that Delta's assumptions about the number of pilots who would opt for early retirement upon the reactivation of lump-sum payments was flawed.  It also argued that Delta had not explored other ways to reduce the number of early retirees, such as placing restrictions on the lump sums or offering bonuses for those who opted to collect their pensions entirely through annuities.

When the hearing commenced on September 1, the Debtors presented testimony from Coleman, an expert in finance, regarding the Debtors' inability to obtain exit financing in the absence of a termination of the Pilot Plan.  Coleman was cross-examined by DP2.  McDaniel, an expert in actuarial and pension matters, also testified on the first day of the hearing regarding the extent of the liabilities represented by the Pilot Plan and the size of the lump sums that would become available

to pilots if the motion was not granted.  When the hearing resumed on September 5, the Debtors announced that they had reached a settlement with DP2 under which DP2 would withdraw its objection to the motion in exchange for $500,000 -- the approximate amount of expenses and attorney fees it had incurred.  Debtors' counsel noted that no other parties had requested to cross-examine Debtors' witnesses or present the testimony of their own.  Additional testimonial evidence was therefore proffered without examination or cross-examination.

The Bankruptcy Judge then asked if anyone else wished to be heard.  Receiving no response, he briefly addressed the parties, observing that "the evidence and arguments ... were and are overwhelming that the company had no alternative ... [but] to take the step they took."  He signed the September 5 Order, finding that each of the Debtors had satisfied the statutory criteria for a distress termination of the Pilot Plan under Section 4041(c).  The Bankruptcy Judge further found that

> [b]ut for the termination of the Pilot Plan, each of
> the Debtors will be unable to (i) obtain exit
> financing that would allow them to emerge from
> bankruptcy; (ii) submit a feasible plan of
> reorganization that would satisfy the standards of
> section 1129 of the Bankruptcy Code, (iii) pay all of
> their debts pursuant to a plan of reorganization and
> (iv) continue business outside of the chapter 11
> reorganization process.

The findings were made "irrespective of the number of Delta pilots who would actually choose to retire early at any specific point(s) in time."

Appellants filed the instant appeal on October 16.[6]  They argue that the September 5 Order should be reversed, or the matter remanded, because (1) the factual basis for the Bankruptcy Court's decision cannot be discerned; (2) the facts in the record do not establish that termination of the Plan is necessary or warranted under Section 4041(c); (3) the Bankruptcy Court did not consider equitable principles that favor continuation of the Plan; and (4) the Notice was insufficient and, as a result, appellants were not afforded an opportunity to be heard.[7]

---

[6] The Official Committee of Unsecured Creditors of Delta (the "Committee") argues that appellants lack standing to appeal since they did not appear at the hearing below.  Certain appellants, however, did file objections to Debtors' motion, and the Committee has pointed to no cases from this circuit that hold that a party's physical presence at a bankruptcy court hearing is a prerequisite to bringing an appeal.  It also merits mention that, with the exception of this superfluous argument, the Committee's brief was almost entirely duplicative of Delta's submission.

[7] It is undisputed that several of the issues raised by appellants were not asserted below.  They are therefore unpreserved for appeal.  Because of the urgency of this matter and the importance of these issues to all parties, this Opinion addresses each of the principal arguments raised by appellants. The issues not covered by this Opinion have been considered by the Court and determined to be without merit.

<u>Discussion</u>

A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree."  Rule 8013, Fed. R. Bankr. P.  On appeal, the legal conclusions of the Bankruptcy Court are reviewed <u>de novo</u>, but the findings of fact are reversed only when they are "clearly erroneous."  <u>Kuhl v. United States</u>, 467 F.3d 145, 147 (2d Cir. 2006) (citation omitted) (per curiam); <u>In re Worldcom, Inc.</u>, 339 B.R. 836, 840 (S.D.N.Y. 2006).


I. The Factual Basis for the Decision

Appellants argue that the factual basis for the Bankruptcy Court's ruling "cannot be discerned and/or is non-existent." That is not the case.  While the September 5 Order is quite brief, it makes specific findings regarding the likely results for Debtors if the Pilot Plan is not terminated.  And although the Order does not directly cite the evidentiary basis for each of the conclusions, there is no mystery about how they were reached, as the record is replete with (often uncontested) testimony and data consistent with the findings.  The Bankruptcy Court received evidence from four expert witnesses and numerous exhibits containing detailed financial information and actuarial projections in support of the termination motion.  Appellants may -- and indeed do -- argue that the factual findings were

flawed, but the record on which they were based is by no means insufficient to permit meaningful review.

II. The Sufficiency of the Evidence

Appellants next argue that Debtors failed to carry their burden of demonstrating financial distress sufficient to justify termination of the Pilot Plan pursuant to Section 4041(c). Under the ERISA statute, when a plan's assets are not sufficient to satisfy all of its benefit liabilities, a plan sponsor may initiate a distress termination pursuant to 29 U.S.C. § 1341(c) if

> the bankruptcy court (or such other appropriate court) determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

29 U.S.C. § 1341 (c)(2)(B)(ii)(IV).[8]

As noted above, the Bankruptcy Judge made precisely these factual findings.  They must be reviewed under the "clearly erroneous" standard.  As the Supreme Court has explained, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, 470 U.S. 564, 574 (1985).  In

---

[8] This is not the exclusive test for determining whether a plan can be terminated under 29 U.S.C. § 1341(c), but it is the only one relevant to the instant appeal.

other words, to reject a finding of fact as clearly erroneous, the court must, upon review of the entire record, be "left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

Here, a review of the record leaves precisely the opposite impression. Debtors submitted evidence that, based on the historical rate of early retirements, more than 800 pilots were likely to retire early when the lump-sum door reopened. According to Debtors' witnesses, this would result in a reduction of approximately one-third of Delta's capacity and lost operating cash flows of between $1.3 and $2.1 billion. The reduction in cash flows would cause Debtors to breach various requirements placed on their current financing arrangements, and the lenders would likely exercise their rights with respect to collateral, which would place the Debtors at risk of liquidation. Further, the Debtors would require between $5.2 and $6.6 billion to exit bankruptcy as a result of the forecast wave of retirements. Even if only 600 pilots exercised the early-retirement option, the Debtors would need $4.4 billion in exit financing; and if the number of early retirements dropped to 300, $3.3 billion would be required. Coleman testified that the Debtors lacked the collateral necessary to raise even the lowest of these amounts.

In the face of this substantial evidence, appellants point to a handful of specific facts that they claim Debtors were required -- but failed -- to demonstrate.  These arguments are flawed, however, as, in every case, Debtors either made a sufficient showing of the fact in question or were not required to do so.

First, appellants appear to argue that Delta's estimate that 800 to 1,000 pilots would immediately take early retirement was "based on pure conjecture and speculation" and, in any event, "rejected" by the Bankruptcy Judge.  Neither argument holds water.  Debtor's projection was based on the proportion of eligible pilots -- 45% -- who had opted for early retirement in the 12 months prior to Delta's bankruptcy filing.  Appellants have provided no reason to believe that that number would be lower if the lump-sum option were reinstituted.  And, given the uncertain financial condition of both Delta and the Plan, there is every reason to believe it would be higher.  Moreover, Delta's estimate was in no way "rejected" by the Bankruptcy Judge, who said it was a "virtual certainty" that the actual number would be at least this high.  The Bankruptcy Judge simply determined that even if the number of early retirees was less than Delta projected -- a result he said he would find "astounding" -- it would not change the fact that Debtors would be unable to exit from bankruptcy.

Second, appellants claim that the 18 Delta subsidiaries failed to show that they each met the criteria of Section 4041(c). This argument is frivolous. In his testimony, Coleman referred repeatedly to the ability of the Debtors -- not just Delta -- to raise capital. Moreover, appellants have not indicated what basis they have to believe that, if Delta could not support the Pilot Plan, its captive subsidiaries would somehow be able to do so on their own.

Third, appellants argue that Coleman's testimony regarding Debtors' inability to obtain exit financing was too speculative to provide a solid basis for the Bankruptcy Court's finding. Coleman's statements were based on his extensive experience in the finance industry, as well as his negotiation of financing for the Debtors since 2004.[9] Appellants have pointed to no legal authority for the proposition that Debtors were required to execute actual applications for exit financing in order to demonstrate that such financing was unavailable.

Fourth, appellants contend that Debtors did not show that they would be unable to exit bankruptcy without terminating the Plan because they did not take into account the impact of the Pension Protection Act of 2006 (the "PPA"), Pub.L. No. 109-280 (2006), recent legislation amending the ERISA statute. McDaniel

---

[9]  At the hearing, Coleman explained in detailed testimony how much collateral lenders would demand for every dollar of exit loans.

testified at the hearing, however, that the PPA would have no impact on the billions of dollars in liquidity shortfall contributions owed by Delta to the Plan.  Appellants have not pointed to any evidence in the record that contradicts this statement.

Fifth and finally, appellants suggest that Debtors failed to show that they would benefit from the termination of the plan.  According to appellants, "[i]f the plan is not terminated, Delta will owe the plan approximately $3 billion, however, if the plan is terminated Delta will still owe the same amount of money to the PBGC, who by statute becomes a trustee of a terminated plan with the power to collect unpaid funding contributions."  While this is technically correct, it omits the fact that the character of the obligation would change.  In the absence of termination, Delta's obligation would be payable in cash; if the Plan were terminated, however, PBGC would have a general, unsecured pre-petition claim against Debtors, which would be paid through a fractional stock distribution after reorganization.  Furthermore, it would allow Debtors to avoid the operational disruption caused by the projected mass retirement of pilots.[10]

---

[10]   In their reply, appellants raise the additional argument that "Debtors withheld material information from the Bankruptcy Court" by failing to disclose the fact that U.S. Airways Group, Inc. ("U.S. Airways") had expressed interest in merging with

III. Equitable Principles

Appellants contend that the Bankruptcy Court failed to take into account various factors that militate against termination on the basis of equitable principles.  It is, of course, uncontested that bankruptcy courts are "courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."  In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994).  Appellants, however, have not pointed to any legal authority for the proposition that decisions of a bankruptcy court should be overturned when the reviewing court disagrees with its view of the equities.  In any event, appellants have not shown that the Bankruptcy Judge failed to take into account the profound impact a termination of the Pilot Plan would have on retired pilots,[11] or that he was

---

Delta.  Given that U.S. Airways did not make an offer to buy Delta until after the September 5 Order was signed, it would appear that appellants' argument is, at the very least, overstated.  Moreover, the offer currently on the table is premised on the termination of the Pilot Plan.  In any event, it is not necessary to reach the issue here, since it was not raised in the first instance with the Bankruptcy Court.

[11]   Indeed, the opposite would seem to be the case.  Before rendering his decision, the Bankruptcy Judge said:
    I have received and read many scores of individual
    letters and submissions by individual retired pilots
    expressing their anxieties and concerns and
    opposition, individual opposition to Delta's motion to
    terminate the pilot plan.  Many of those letters were
    very moving.  ...  I read those letters and I

unaware of the previous sacrifices they had made for the airline.

Appellants' argument that Delta misled the Bankrupcty Court and retired pilots by stating that pilots "would still get, on average, eighty-five to ninety percent of their qualified plan benefits" is similarly unavailing.  According to appellants, this statement was shown to be false after the hearing, when, on September 22, Delta sent notices to approximately 1,400 retired pilots explaining that their monthly benefit check would be "reduced to zero."  While this news was no doubt surprising and deeply disappointing to the recipients of the notice, it does not show that Debtors' statement was untrue.[12]

---

appreciate deeply the sentiments expressed.  It is a very, very hard thing to work a whole career in the expectation of a secure retirement and have, in some cases long after retirement ... the shocking realization that the full extent of the pension expectation would not be realized.

[12] The explanation for this apparent discrepancy is complicated and is not necessary to examine in depth here.  It is sufficient to note that it rests on two uncontested facts: (1) the 85-90% figure is an average estimate, meaning that some pilots will receive more and some less; (2) the lump-sum payments are calculated based on a pilots' projected total pension benefit, but paid exclusively out of qualified funds, meaning many retired pilots collected more than 50% of their qualified benefit up front.  Furthermore, as indicated in Delta's September 22 letter, even those retirees whose benefit has been eliminated may again begin receiving payments when the PBGC assumes responsibility for the Plan.

IV. Sufficiency of the Notice

The principles of due process require that "a deprivation of property be preceded by notice that is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action.'" <u>Brody v. Village of Port Chester</u>, 434 F.3d 121, 127 (2d Cir. 2005) (<u>quoting</u> <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950)). Appellants claim that the Notice provided by Debtors was insufficient to provide them with a right to be heard.  They argue that it was defective in that it did not comply with the Bankruptcy Court's Case Management Order, and misled them into believing that organizations representing their interests either did not object to the motion or would appear at the hearing. Although there were defects in the Notice, those shortcomings did not violate appellants' due process rights.

Appellants identify three ways in which the Notice did not conform to the requirements of the Case Management Order: (1) the motion itself was not attached; (2) it did not provide a list of the parties on which objections were required to be served; and (3) it did not inform recipients that the relief requested could be granted without a hearing if no objections were filed.[13]  These deficiencies did not deprive appellants of

---

[13]  There was no need for the Notice to include the requirement that pilots comply with the Case Management Order in making

either adequate notice or an effective opportunity to be heard.
Appellants were provided with the Internet address at which the
motion could be located; they were also provided with the name,
phone number, and address of Debtors' counsel if they wished to
request the document or the service list.  More importantly,
however, appellants have not shown that they were prejudiced by
these omissions, since many pilots -- including some appellants
-- did submit objections; there is no evidence that any
objections were rejected by the Bankruptcy Judge for defects in
service or timeliness; and in light of the objections, a hearing
was, in fact, held.

Appellants also argue that Debtors "misled" them by stating
in their motion that DP3 and ALPA did not oppose the relief
sought.  This statement was, however, correct.  To the extent
retired pilots mistakenly believed that ALPA would represent
their interests, as opposed to those of active pilots, Debtors
cannot be held responsible for this misapprehension.  It appears
that appellants' true concern is over DP2's mid-hearing
withdrawal of its opposition to the motion.  They complain that,
"no effort was made on the part of the Court, the Debtors, or
DP2 to allow retired pilots a meaningful opportunity to be

their objections, and its instruction in this regard is
surprising since it placed unnecessary burdens on both Delta and
the pilots.  In the future, Delta should consider seeking an
order governing notice to plan participants that is tailored to
that purpose.

heard" after the withdrawal.  No such effort was required,
however, since that opportunity was provided through the
original Notice.


Conclusion

    For the foregoing reasons, the Bankruptcy Court's September
5 Order is affirmed.  The Clerk of Court shall close the case.


    SO ORDERED:


Dated:    New York, New York
          December 11, 2006


                                    _____
                                    DENISE COTE
                              United States District Judge